IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NINE POINT ENERGY HOLDINGS, INC., *et al.*, | : | Case No. 21-10570 (MFW) |
| | : | |
| Debtors. | : | |
| _____ | : | |
| CALIBER NORTH DAKOTA, LLC, CALIBER | : | |
| MEASUREMENT SERVICES, LLC, and | : | |
| CALIBER MIDSTREAM FRESH WATER | : | |
| PARTNERS, LLC, | : | |
| | : | |
| Appellants, | : | Civ. No. 21-972-RGA |
| v. | : | Civ. No. 21-973-RGA |
| | : | Civ. No. 21-974-RGA |
| NINE POINT ENERGY HOLDINGS, INC., | : | Civ. No. 21-975-RGA |
| NINE POINT ENERGY, LLC, and AB | : | Civ. No. 21-976-RGA |
| PRIVATE INVESTORS LLC, as Agent for the | : | |
| Debtors' Prepetition and Postpetition Lenders, | : | |
| | : | |
| Appellees. | : | |

## **OPINION**

Curtis S. Miller, Taylor M. Haga, Nader A. Amer, Morris Nichols Arsht & Tunnell LLP, Wilmington, DE; David A. Felice, Kevin W. Barrett, Maggie B. Burns, Bailey & Glasser LLP, Wilmington, DE, attorneys for appellant Caliber North Dakota, LLC, Caliber Measurement Services, LLC, and Caliber Midstream Fresh Water Partners, LLC.

Heather Lennox, Robert S. Faxon, Jones Day, Cleveland, OH; Matthew C. Corcoran, Jones Day, Columbus, OH; Michael R. Nestor, M. Blake Cleary, Kara Hammond Coyle, Michael S. Neiburg, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, attorneys for appellees Nine Point Energy Holdings, Inc., Nine Point Energy, LLC.

David M. Hillman, Michael T. Mervis, Charles A. Dale, Proskauer Rose LLP, New York, NY; Adam G. Landis, Kerri K. Mumford, Matthew R. Pierce, Landis Rath & Cobb LLP, Wilmington, DE, attorneys for appellee AB Private Credit Investors, LLC.

July 30, 2021

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Before the Court is an appeal (Civ. No. 21-973-RGA, D.I. 1) by Caliber Measurement Services LLC, Caliber Midstream Freshwater Partners LLC, and Caliber North Dakota LLC (collectively, "Caliber") from the Bankruptcy Court's June 29, 2021 *Order (I) Approving the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Approving the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (B.D.I. 528)[1] ("Sale Order"). This dispute arises in the chapter 11 cases of Nine Point Energy Holdings, Inc., Nine Point Energy, LLC, Foxtrot Resources, LLC, and Leaf Minerals, LLC (collectively, "NPE" or the "Debtors").

On July 6, 2021, I granted a limited stay to facilitate an "expedited review of the merits of the appeal of the Sale Order." (D.I. 11). The merits of the Sale Order appeal have been fully briefed by the parties, including appellee AB Private Credit Investors, LLC, in its capacity as agent for the Debtors' prepetition first lien lenders and debtor-in-possession lenders (the "Agent"). (D.I. 15, 27, 28, 40). On July 30, 2021, I heard oral argument. (D.I. 47). Notably, Caliber has devoted substantially all of its Opening Brief (D.I. 15) to the merits of four other appeals from different Bankruptcy Court orders:

1. The *Order Granting Plaintiffs' First Motion for Partial Summary Judgment* (Adv. D.I. 82) and the *Order Granting Plaintiffs' Second Motion for Partial Summary Judgment* (Adv. D.I. 83) (together, the "SJ Orders") which declared that (a) "nothing in the MSA [defined below], including the Interests and Dedications, were a covenant running with the land in favor of Caliber," (b) the Debtors are able to reject the MSAs, and (c) the Debtors may sell their assets free and clear of rights of Caliber under the MSAs pursuant to §§ 363(f)(4) and (f)(5) of the Bankruptcy Code. Caliber's appeals of the

---

[1] The docket of the Chapter 11 cases, captioned *In re Nine Point Energy Holdings, Inc., et al.*, No. 21-10570 (MFW), is cited herein as "B.D.I. __." The docket of the adversary proceeding, captioned *Nine Point Energy Holdings, Inc. et al. v. Caliber Measurement Servs. LLC*, Adv. No. 21-50243 (MFW) (Bankr. D. Del.), is cited herein as "Adv. D.I. __." All citations to the docket are to Civ. No. 21-973-RGA unless otherwise indicated. All citations to the appendices filed in support of Caliber's opening brief (D.I. 16 – D.I. 23) and the Debtors' answering brief (D.I. 29 – D.I. 30) follow this format: "Appx.[Appendix Item Number].[Appendix Pagination]."

SJ Orders are pending at Civ. No. 21-975-RGA and Civ. No. 21-976-RGA (together, the "SJ Orders Appeals").

2. The Bankruptcy Court's bench ruling issued on June 28, 2021 (Appx.5.A-0596), which is further supported by the Bankruptcy Court's written opinion issued July 7, 2021 (Appx.12.A-0867-A-0898), and memorialized in the Order dated July 19, 2021 (B.D.I. 581) ("Claim Objection Order"), and which reclassified Caliber's asserted secured claim under the RCA [defined below] in the amount of approximately $150 million as a general unsecured claim. Caliber's appeal of the Claim Objection Order is pending at Civ. No. 21-974-RGA (the "Claim Objection Appeal").

3. The Bankruptcy Court's bench ruling issued on June 29, 2021 (Appx.6.A-0638) ("Rejection Order") authorizing (but not requiring) the Debtors to reject certain contracts with Caliber, which was memorialized by the *Order Authorizing Debtors to Reject Certain Executory Contracts* (B.D.I. 540) ("Rejection Order"). Caliber's appeal of the Rejection Order is pending at Civ. No. 21-972-RGA (the "Rejection Order Appeal").

In its emergency motion for stay pending appeal of the Sale Order (D.I. 3), Caliber stated that it intended to move to consolidate and expedite all of its appeals. (*See* D.I. 3 at 2 n.2). To date, however, Caliber has neither moved to expedite its other appeals nor to consolidate them. The Agent rightfully argues that the expedited appeal "thus relates *only* to the Sale Order." (D.I. 27 at 2).

According to Caliber, the propriety of the Sale Order—in particular, its failure to adequately protect Caliber's liens and other interests—rests on the propriety of the Bankruptcy Court's prior rulings denying Caliber's liens and other interests, and the Court should consider all of the appeals under the merger rule, pursuant to which a final order "draws in question all prior non-final orders and rulings which produced the [final order]." (D.I. 40 at 22 (citing *Pension Tr. Fund for Operating Engineers v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 269 (3d Cir. 2013)). Caliber argues that, while the Agent has faulted Caliber for failing to seek to consolidate its appeals of the prior orders with this appeal, "such consolidation has not proved necessary, as both Caliber and the appellees have fully briefed all relevant issues, including issues relating to the prior orders, in their briefs on this appeal." (D.I. 40 at 25). Contrary to Caliber's

3

assertions (D.I. 40 at 22), Appellees have not argued that this Court lacks jurisdiction to review the prior orders in this appeal. Rather, Appellees have noted that Caliber's inconsistent statements have created needless confusion for the Court and the Appellees. I agree and this is especially unfortunate in the context of the expedited consideration the Court granted.

Review of all the underlying orders, however, is permissible here. *See Pension Tr. Fund*, 730 F.3d at 269 (appellate jurisdiction extends to prior orders—including those not specified in the notice of appeal—so long as "(1) there is a connection between the specified and unspecified orders; (2) the intention to appeal the unspecified order is apparent; and (3) the opposing party is not prejudiced and has a full opportunity to brief the issues.'"). First, there is no question that the Sale Order was a "final order." (Appx.A-0712; *see also In re Culp*, 550 B.R. 683, 691 (D. Del. 2015). Second, appellees appear to agree that the Sale Order was predicated on the Bankruptcy Court's prior orders. Specifically, they argue that approval of the sale free and clear of Caliber's asserted interests without providing adequate protection was proper because the Bankruptcy Court had previously held that rejection extinguished Caliber's Dedications and denied Caliber's $150 million lien. (D.I. 27 at 3; D.I. 28 at 53, ¶ 91). Finally, as Caliber has "fully briefed all relevant issues, including issues relating to the prior orders, in [its] briefs on this appeal" (D.I. 40 at 24-25 n.32), and Debtors had no other prudent choice but to respond to each of those arguments in their comprehensive brief (D.I. 28), there appears to be no prejudice to any party. Finally, judicial economy supports addressing the merits of the Sale Order appeal along with the merits of the appeals of each of the underlying orders rather than addressing the merits of each in a separate decision.

For the reasons set forth below, the Sale Order, SJ Orders, Claim Objection Order, and Rejection Order are each affirmed.

## I.   BACKGROUND

### A.   The Parties' Prepetition Relationship

The Debtors are an independent oil and gas exploration and production company focused on the development of shale oil and natural gas resources in the Williston Basin of North Dakota and Montana.  (Appx.54.A-4398 ¶ 10).  The Debtors or NPE's predecessor-in-interest – Triangle USA Petroleum Corporation ("TUSA") – have been operating wells in the Williston Basin since 2011.  (*Id.*, A-4400 ¶¶ 10, 14-15).  At the time of these appeals, the Debtors held interests in, and operated, approximately 198 wells, mainly in North Dakota.  (*Id.*, A-4398  ¶ 10).

While TUSA was developing its oil and gas wells in 2012, TUSA and Caliber agreed that Caliber would provide certain midstream services for a significant portion of TUSA's wells pursuant to several long-term services contracts.  At the time, the parties understood that Caliber planned to construct a pipeline system to gather and transport oil and gas produced at various wells to central locations for delivery to the interstate marketplace.  (*See* Appx.3.A-0247:15-0248:18; Appx.4.A-0503:11-15; Appx.54.A-4405-4406 ¶¶ 25-29).  The parties also understood that Caliber would own those pipelines and would use them to provide services to TUSA's competitors from the outset of the parties' relationship.  (*See* Appx.3.A-0293:9-13, A-0297:19-0299:15; Appx.4.A-0576:11-0577:4).

TUSA filed for bankruptcy in 2016 and later merged into NPE in 2017 pursuant to TUSA's confirmed chapter 11 plan.  (Appx.54.A-4401 ¶¶ 16-17).  Afterward, NPE became TUSA's successor under the Caliber midstream services contracts.  Over the years, the various midstream services contracts were amended and restated, sometimes before and sometimes after the TUSA/NPE merger.  (*See* Appx.44-47.A-3617-3997; Appx.49-50.A-4007-4248; Appx.64-67.A-5965-6085).  The operative midstream services contracts relevant to the appeal include: (a) the Second Amended and Restated Midstream Services Agreement, dated January 1, 2018, by and

between NPE and Caliber (Appx.50.A-4113-4247); and (b) the Second Amended and Restated Midstream Services Agreement (Crude Oil), dated January 1, 2018, by and between NPE and Caliber (Appx.49.A-4007-4112) (collectively, the "MSAs"). Under Article 3 of the MSAs, NPE agreed to pay Caliber certain fees for the actual midstream services that Caliber provided. NPE and Caliber also were parties to the Revenue Commitment Agreement, dated September 12, 2013 (Appx.48.A-3998-4006) ("RCA"). Under the RCA, NPE agreed to pay Caliber a minimum monthly amount for midstream services—e.g., gathering, processing and transportation—subject to certain credits or deficit fees depending on the volumes of fluids processed for the month. (Appx.48.A-3998-3999 §§ 1(a), 2; B.D.I. 23 at ¶ 25).

Immediately prior to filing bankruptcy, NPE purported to terminate its contracts with Caliber. (Appx.54.A-4406-4407 ¶ 30.3). As described below, Debtors commenced litigation seeking a declaration that NPE properly terminated its contracts with Caliber at the outset of the chapter 11 cases. At the time of the appeals, the Bankruptcy Court had not yet ruled on that issue.

### B.     The Chapter 11 Cases

In 2020, oil and gas prices dropped precipitously, negatively impacting Debtors' revenues and cash flows. (Appx.54.A-4417-4418 ¶ 56-58). Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on March 15, 2021. (Appx.54.A-4397-4498, 4417-4418 ¶¶ 7, 56-59). The same day, Debtors made several filings pertinent to this appeal. First, Debtors commenced an adversary proceeding ("First Adversary Proceeding") against Caliber, seeking, among other things, declarations that (a) NPE's prepetition contractual terminations were valid; (b) the MSAs did not contain covenants running with the land; and (c) the Debtors could sell their assets free and clear of Caliber's purported contractual rights. (Appx.58.A-4743-5226). Second, Debtors filed a motion seeking (a) approval of a sale process for substantially all of the Debtors' assets and (b) authorization to enter into an asset purchase agreement with a stalking horse bidder

("Sale Motion"). (Appx.31.A-2433-2568). Third, Debtors filed a motion seeking authorization to reject the Caliber contracts to the extent the Bankruptcy Court later determined that NPE had not terminated the Caliber contracts prepetition ("Rejection Motion"). (Appx.37.A-3055-3083).

### C.     The First Adversary Proceeding and the SJ Orders

On March 16, 2021, Debtors filed a motion for partial summary judgment in the First Adversary Proceeding seeking a declaration that the Caliber contracts did not contain covenants running with the land. (Appx.21-22.A-1619-1657). On March 26, 2021, Debtors filed another motion for partial summary judgment, seeking a declaration that Debtors could reject, and sell their assets free and clear of, Caliber's purported contractual rights. (Appx.23-24.A-1658-1692).

On May 4, 2021, the Bankruptcy Court granted summary judgment from the bench, holding that the Caliber contracts did not contain covenants running with the land and that the Debtors could reject, and sell their assets free and clear of, Caliber's purported contractual rights. (Appx.1.A-0106:12-0114:21, 0134:18-0141:8). On May 12, 2021, the Bankruptcy Court entered the two SJ Orders. In the first order, the Bankruptcy Court declared that "the Caliber Contracts do not contain covenants that run with the land or equitable servitudes." (Appx.7.A-0678-0681) ("First SJ Order") ¶ 2). In the second order, the Bankruptcy Court declared that "the rejection of the Caliber Contracts would constitute a rejection of every term thereof, including the Dedications and Interests," and that "Plaintiffs may sell their property free and clear of any claim or interest under the Caliber Contracts" ("Second SJ Order"). (Appx.8.A-0682-0685).     On June 1, the Bankruptcy Court entered a written opinion in connection with the SJ Orders:[2]

> [T]he MSA did not grant any interest in a Real Property Estate under North Dakota law for several reasons. First, no interest in the Mineral Rights held by the Debtors was granted to Caliber because the MSA confirmed that the Debtors at all times retained title to the Mineral Rights. (MSA at §§ 7.3, 10.2(c) (iv) & 10.2(k).)  While the MSA granted Caliber

---

[2] The opinion is available at 2021 WL 2212007 (Bankr. D. Del. June 1, 2021).

control over the produced oil and gas, that is not the grant of an interest in real property under North Dakota law....

Further, the Surface Rights granted to Caliber under the MSA are not covenants that run with the land under North Dakota law, because the grant of an easement or other non-exclusive interest in the surface of land is not an estate in real property or "appurtenant" to an estate in real property. ... The MSA did not grant Caliber the exclusive right to use of the Surface Rights; instead, the Debtors granted Caliber only a non-exclusive right to access the property for the purpose of constructing and maintaining the pipeline and related facilities necessary for Caliber to perform its obligations under the MSA. (MSA § 14.1)....

...[T]he Interests and Dedications are not covenants that run with the land because they do not directly touch on or concern the real property interests of the Debtors, namely the mineral interests. ... [T]he covenants provided no direct benefit to the mineral interests, but only personal benefits to the Debtors by providing transportation of the Debtors' personal property (the severed oil and gas) and related services for a fee. Thus, ... they do not satisfy the requirement of North Dakota law that to run with the land a covenant must directly benefit the real property....

(Appx.9.A-0695-0696). The Bankruptcy Court certified the SJ Orders as final on June 17, 2021.

(Appx.13-14.A-0899-0906). Thereafter, on June 30, 2021, Caliber filed the SJ Orders Appeals.

(Appx.15-16.A-0907-0940; Civ. No. 21-975-RGA and Civ. No. 21-976-RGA).

### D.     Caliber's Asserted Statutory Well Lien and Second Adversary Proceeding

On May 27, 2021, Caliber filed three proofs of claim, asserting that purported senior liens on several of the Debtors' oil and gas leaseholds under North Dakota Century Code section 35-24-02 ("Statutory Well Lien") secured: (a) Caliber ND's (i) approximately $7.1 million asserted claim for prepetition and postpetition services provided under the Caliber contracts, and (ii) approximately $150 million asserted claim for future payments under the RCA; (b) Caliber Fresh Water's approximately $84,000 claim for prepetition and postpetition fresh water sold to NPE under the Caliber contracts; and (c) Caliber Measurement's approximately $477,000 claim for prepetition and postpetition services provided under the Caliber contracts. (Appx.51.A-4248-4299). Caliber also filed statements of lien with the recorders of Williams and McKenzie Counties, North Dakota. *See id.*

8

On June 1, 2021, NPE commenced a second adversary proceeding against Caliber ("Second Adversary Proceeding"). (Appx.59.A-5227-5786). NPE contemporaneously filed a summary judgment motion (Appx.60.A-5787-5796) asking the Bankruptcy Court to declare that (a) Caliber does not have a valid Statutory Well Lien or (b) alternatively, Caliber improperly asserted liens on approximately $150 million for future services payments under the RCA. (*See id.*) The next day, NPE filed the *First Omnibus Objection of Nine Point Energy, LLC to Caliber's Misclassified Proofs of Claim (Substantive)* (Appx.39.A-3088-3422) ("Caliber Claim Objection") seeking similar relief.

The Bankruptcy Court held hearings on June 17, 24, and 25, 2021. On June 28, 2021, the Bankruptcy Court in relevant part sustained the Caliber Claim Objection, ruling from the bench that "[t]he payment of fees under all the agreements ... is not based on the construction cost incurred by Caliber in constructing the pipeline." (Appx.5.A-0607:23-0608:8). On June 30, 2021, Caliber filed the Claim Objection Appeal. (Appx.19.A-1101-1148; Civ. No. 21-974-RGA). On July 7, the Bankruptcy Court entered a written opinion[3] that explained its June 28th ruling. (*See* Appx.12.A-0867-0898). The Bankruptcy Court identified five reasons supporting its holding that the approximately $150 million claim under the RCA was a claim for future services that Caliber has not provided, and not a claim for reimbursement of construction costs. (Appx.12.A-0880-0881).

First, "none of the agreements between the parties contain a provision requiring the Debtors to pay Caliber for any of its specific construction costs." (Appx.12.A-0880). Second, "the [RCA] was executed by the parties in September 2013, at which time Caliber had not constructed all of the pipelines." (*Id.*; *see also* Appx.5.A-0609:9-18). Thus, "it was not reasonable to conclude that the Debtors agreed to pay $405 million for an unknown amount of pipelines yet to be constructed

_____

[3] The opinion is available at 2021 WL 2828916 (Bankr. D. Del. July 7, 2021).

by Caliber or needed by the Debtors." (Appx.12.A-0880). Third, "Caliber retained title to the pipelines it constructed [and] use[d] the pipelines for the transport of product for other oil and gas producers." (*Id.*; *see also* Appx.5.A-0608:9-20). Thus, "it was not a reasonable interpretation of the agreements that they required the Debtors to pay for a pipeline owned by Caliber and used by it to generate other revenue." (Appx.12.A-0880). Fourth, "[i]f the amount due under the [RCA] was only for the construction of the pipeline, that would mean that Caliber agreed to perform all the other services free of charge," which "is not a reasonable interpretation of the agreements." (*Id.* A-0881). Finally, "none of the parties' other records supported Caliber's interpretation of the agreements." (*Id.*) "For example, the financial statements of neither Caliber nor the Debtors reflected an obligation by the Debtors to pay Caliber for construction of the pipelines." (*Id.*; *see also* Appx.5.A-0609:9-18). On July 19, 2021, the Bankruptcy Court entered the Claim Objection Order.

E.     **Sale Order**

On April 12, 2021, the Bankruptcy Court entered the *Order (I) Authorizing and Approving Bidding Procedures, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, and (IV) Establishing Notice and Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases* (Appx.62.A-5815-5961) ("Sale Procedures Order"). The Sale Procedures Order scheduled the sale hearing for June 17, 2021 and authorized the Debtors to enter into the Stalking Horse Agreement with the Stalking Horse Bidder ("Buyer"), subject to higher and better offers. (Appx.62.A-5820-5821 ¶¶ 6, 8). The Sale Procedures Order set a June 11, 2021 deadline for other parties to submit bids for the Debtors' assets. (Appx.62.A-5819 ¶ 3). On June 14, 2021, having received no other bids, the Debtors declared the Buyer the successful bidder, subject to Bankruptcy Court approval at the sale hearing. (Appx.63.A-5962-5964). After the Bankruptcy Court issued its ruling on the Caliber Claim

Objection on June 28, 2021, and having previously received evidence in support of the Sale Motion, the Bankruptcy Court considered the request to approve the sale of substantially all the Debtors' assets to the Buyer along with Caliber's objection and demand for adequate protection of its purported interests in the purchased assets. On June 29, 2021 the Bankruptcy Court entered the Sale Order. On June 30, 2021 Caliber filed the Sale Order appeal. (Appx.18.A-0947-1100; Civ. No. 21-973-RGA).

      **F.**    **Rejection Order**

      On June 30, 2021, the Bankruptcy Court entered the *Order Authorizing Debtors to Reject Certain Executory Contracts* (Appx.11.A-0858-0866) (the "Rejection Order"), "authoriz[ing], but not direct[ing], [the Debtors] to reject one or more of the Caliber Contracts." (Appx.11.A-0860 ¶ 2). Caliber filed the Rejection Order Appeal the same day. (Appx.17.A-0941-0946; Civ. No. 21-972-RGA).

**II.**    **JURISDICTION AND STANDARD OF REVIEW**

      The Court has jurisdiction to hear an appeal from a final judgment of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1).[4] In reviewing the bankruptcy court's determinations, this Court "review[s] the bankruptcy court's legal determinations *de novo,* its factual findings for clear error and its exercise of discretion for abuse thereof." *See In re Trans World Airlines, Inc.*, 145 F.3d 124, 130 (3d Cir. 1998) (noting that both the Third Circuit and the district court "exercise the same standard of review") (internal quotations and citations omitted).

---

[4] Since all the challenged orders are subject to review in connection with the Sale Order appeal, I have not made an independent determination of appellate jurisdiction for each of the other appeals.

## III.   ANALYSIS

### A.   The Bankruptcy Court Correctly Determined that a Rejection of the MSAs Would Constitute a Rejection of Every Term Thereof

Caliber asserts that the Bankruptcy Court erred when holding that the dedications made in Article 10 of the MSAs (the "Dedications") would not survive (i.e., continue to be effective after) the rejection of the MSAs.   (D.I. 15 at 20-33).   The Dedications provide, among other things, that NPE:

> "exclusively dedicates, grants, and commits to the performance of this Agreement . . . all of the Dedicated Properties[5] and the Producer Gas in place and Producer Wells located on the real property covered by the Phase 1 Dedicated Properties"; and

> "agrees not to deliver any Producer Gas produced from the Phase 1 Dedicated Properties to any other gas gatherer, gas purchaser, gas marketer or other Person prior to the Delivery Points."

(Appx.49, Appx.50, § 10.1(a)(i)).   Caliber argued below that even if the Debtors reject the MSA, its Dedications survive because rejection is merely a breach, not a termination, of a contract.   11 U.S.C. § 365(g).   Caliber relied on the Supreme Court's holding in *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019).   In that case, the contract at issue was a trademark license agreement.   The Supreme Court held that the rejection of the contract did not eliminate the license.   *Id.* at 1662.   Instead, the Supreme Court held that the counterparty had the right to continue to use that license after rejection, notwithstanding the fact that the debtor was relieved of its obligation to perform.   *Id.*   Caliber cites the following from the *Mission Product* decision:

> Rejection of a contract—any contract—in bankruptcy operates not as a rescission but as a breach. . . . '[B]reach' . . . means in [bankruptcy] what it means in contract law[.]  . . . When [a breach] occurs, the [breaching party] and counterparty do not go back to their

---

[5] The "Dedicated Properties" are defined to include "all interests of [NPE] . . . in the oil, gas, and/or mineral leases identified in [exhibits to the contract] . . . and all Gas and Produced Water produced or delivered therefrom or attributable thereto and Fresh Water delivered thereto, and all present and future interests of [Nine Point] . . . in [certain wells]." (Appx.49, Appx.50).

pre-contract positions. Instead, the counterparty retains the rights it has received under the agreement.

*Id.* at 1661-62. Based on this language, Caliber argues that rejection relieves the debtor of future performance under a contract, but "prevents a debtor . . . from recapturing interests it ha[s] given up." (D.I. 15 at 21 (citing *Mission Prod.,* 139 S. Ct. at 1663)). The Bankruptcy Court rejected Caliber's argument, finding that the facts of the *Mission Product* case were distinguishable. "In this case," the Bankruptcy Court explained, "under the express terms of the MSA, Caliber has no right to use the Interests and Dedications except in its performance of the contracts." (A0702 (emphasis in original) (citing MSA at §§ 10.1 & 14.1)). "[T]his case is therefore different from the facts in *Mission Product,* where the counterparty had the right to use the license in its business and was not limited to using it in performance of services to the debtors." (Appx.9.A-0702-A0703). "Furthermore," the Bankruptcy Court noted, "if the MSA is rejected, the Debtors will have no further obligation to pay Caliber. It is unlikely that Caliber will want to continue to perform the contracts when it will not be paid for that performance and, therefore, Caliber would have no further use for the Interests or Dedications" following the Debtors' rejection. (Appx.9.A-0703) (citation omitted).

Caliber argues on appeal that the Bankruptcy Court's holding failed to adhere to *Mission Product* regarding the effect of rejection and included improper findings of disputed fact on summary judgment. (D.I. 15 at 23-25). Caliber also now argues that the Dedications would "prohibit the Debtors from using any other party to perform the services Caliber provides" even after rejection. (*Id.* at 24). According to Caliber, the Bankruptcy Court's finding that Caliber would not choose to retain the Dedications post-rejection was improper for summary judgment as no evidence was presented regarding Caliber's continued desire or ability to use the Dedications after rejection. (*Id.* at 23-24). Caliber further argues that this finding misconstrues the purpose and function of the Dedications. (*Id.* at 24). "The Dedications not only facilitated

13

Caliber's performance of its contracts with the Debtors.  They also prohibit the Debtors from using any other party to perform the services Caliber provides—a right that continues to have value after rejection.  Under the Caliber Contracts, if [NPE] wants to transport oil from the wells dedicated to Caliber, it must transport that oil through the pipelines Caliber spent hundreds of millions to build."  (*Id.*)  As opposed to having "no further use for the Interests or Dedications," as the Bankruptcy Court determined, Caliber argues that this exclusive right has "enormous value."  (*Id.*)  Conversely, Debtors argue that Caliber has recast the Dedications as a contractual exclusivity right for the first time on appeal, that an exclusivity provision is an executory obligation of a debtor, and that, like any other executory obligation, a debtor does not have to perform it after rejection.  (D.I. 28 at 20-26).

I agree with the Debtors.

When a debtor rejects a contract, it "repudiat[es] any further performance of its duties." *Mission Prod.*, 139 S. Ct. at 1658.  *Mission Product* stands for the proposition that rejection cannot restrain a non-debtor's use of its contractual rights that do not depend on the debtor's future performance; it does not allow a non-debtor to force the debtor to perform under a contract after its rejection.[6]  The Bankruptcy Court correctly distinguished *Mission Product* from this case; unlike the trademark licensee who could use the debtor's intellectual property without the involvement of the debtor, "in this case under the express terms of the MSA, Caliber has no right to use the Interests and Dedications <u>except</u> in its performance of the contracts," (Appx.9A-0702 (emphasis in the original)), which can only occur after the Debtors perform by extracting fluids

---

[6] At oral argument, the parties discussed a case that only appears in the briefing as part of a string cite in the reply brief.  (D.I. 40 at 3).  That case, *In re Avianca Holdings, S.A.*, 618 B.R. 684, 707 (Bankr. S.D.N.Y. 2020), does not advance the ball for either side.  As I read it, the case determined that a right to an income stream from a third party had been previously sold as part of a contract.  The counterparty could receive the income stream without the debtor doing anything.  That is, there was no requirement of any future performance by the debtor.  Thus, the debtor could not get the right to the income stream back by rejecting the contract.

and sending them to Caliber for processing and transportation. The necessary performance by the Debtors was the foundation of the Bankruptcy Court's ruling. As the Debtors correctly point out, Caliber's reading would allow any contract counterparty to inoculate itself from the effects of rejection by including an exclusivity provision in its contract.[7] Such a broad and overarching result would fundamentally impair a debtor's ability to reorganize by forcing it to continue to perform under burdensome contracts, contrary to the purpose of § 365 of the Bankruptcy Code.

Finally, because the Dedications are inoperative as a practical matter without the Debtors' post-rejection performance, the Bankruptcy Court correctly determined that the Dedications would have no practical effect after rejection. While Caliber casts this as improper fact finding on a summary judgment motion, I agree with the Debtors that it was not finding of fact but rather the application of logic to the uncontested facts of this case.

### B.       The Bankruptcy Court Correctly Determined that the MSAs Do Not Contain Covenants Running with the Land

Caliber contends that the Bankruptcy Court erred when it held that the Dedications are not covenants running with the land under North Dakota law, which the parties agreed applies here. (D.I. 15 at 26-34). In order for a covenant to run with the land under North Dakota law, the covenant must (1) be "contained in a grant of an estate in real property," and (2) be made "for the direct benefit of the property" (*i.e.*, "touch and concern" the land). N.D. CENT. CODE § 47-04-26; *see also id.* § 47-04-24 (providing that to "run with the land" a covenant must be "contained in grants of estates in real property"); *id.* § 47-04-25 ("The only covenants which run with the land are those specified in this chapter and those which are incidental thereto.").

---

[7] The fundamental flaw in Caliber's argument is that an "exclusivity" provision requires future performance by both parties. Thus, while it is possible to view an exclusivity provision as something that belongs to Caliber, it only has meaning if it is an obligation of NPE. In other words, the exclusivity provision is an obligation that binds NPE to perform in a certain way.

### 1.    Intent of the Parties

Caliber points out that the MSAs contain language supporting the parties' intent to create a covenant running with the land.  (D.I. 15 at 26) (citing Appx.49 & 50, § 10.1(a)(iii) ("the Dedication made by Producer under this Agreement . . . is a covenant running with and burdening the land")).  The parties' intent, however, does not determine whether a covenant runs with the land under the applicable law.  The North Dakota Supreme Court has held "that the parties' intent, no matter how clearly expressed, cannot make a personal covenant run with the land…." *Beeter v. Sawyer Disposal LLC*, 771 N.W.2d 282, 286 (N.D. 2009).  Caliber contends that the North Dakota Supreme Court held otherwise in *Wheeler v. Southport Seven Planned Unit Dev.*, 821 N.W.2d 746 (N.D. 2012).  In that case, however, the North Dakota Supreme Court merely held that contract interpretation rules are used to determine the requirements of a covenant—and did not address intent.  *Id.* at 753.  As the Debtor correctly points out, while intent is an element in the various states' laws applicable in the out-of-circuit bankruptcy cases on which Caliber relies, it is not under North Dakota law.  *See Occidental Petroleum Corp. v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)*, 2021 WL 1822708, at *11 (Bankr. S.D. Tex. May 6, 2021) (intent is an element under Texas law); *Alta Mesa Holdings, LP v. Kingfisher Midstream, LLC (In re Alta Mesa Res., Inc.)*, 613 B.R. 90, 100 (Bankr. S.D. Tex. 2019) (same under Oklahoma law); *Monarch Midstream LLC v. Badlands Prod. Co. (In re Badlands Energy, Inc.),* 608 B.R. 854, 867 (Bankr. D. Colo. 2009) (same under Utah law).

The Bankruptcy Court further determined that the purported covenants did not meet the statutory criteria.  As discussed below, I agree.

### 2.    "Contained in a Grant of an Estate in Real Property"

The statutory requirement that a covenant must be "contained in a grant of an estate in real property" is  sometimes referred to as "privity."  Caliber argues that the element is satisfied

16

here "because the same contracts that contained the Dedications also contained a grant of an estate in real property—an easement." (*See* Appxs.49 & 50, § 14.1 ("Producer hereby grants to Gatherer a non-exclusive easement on, over and through the Dedicated Properties to the extent necessary for Gatherer's performance of its obligations hereunder and realization of the benefits provided herein to the extent Producer obtained such rights under each Oil and Gas Lease.")

The Bankruptcy Court held that the MSAs did not grant Caliber an estate in real property. (*See* Appx.9.A0695). While Caliber contends on appeal that the Dedications are covenants running with the land, Caliber does not contend that the Dedications are a grant of an estate in real property. Rather, Caliber contends only that the easements provided in an entirely different article of the MSAs (Article 14) than the Dedications (Article 10)—which easements were first provided in the current MSAs six years after the Dedications were made—satisfy the "contained in a grant of estate in real property" element. Specifically, the Dedications were made in 2012 and 2013, and the easements were provided in the 2018 amendments to the MSAs. The Debtors argue that the 2012 and 2013 Dedications, thus, could not be "contained in [the 2018] grant of" the easements. The Bankruptcy Court concluded that it was not necessary to decide this issue, however, because even if the language in the 2018 amendments to the MSA were in the original MSA, that language is insufficient to grant Caliber any interest in any real property estate. (*See* Appx.9.A-0694).

I agree that the language is insufficient, for the reasons set forth by the Bankruptcy Court.

Even if the earlier Dedications could be found to be conveyed in the later-provided easements, the easements still would not satisfy the "contained in a grant of an estate in real property" element. Under North Dakota law, an estate in real property must provide for the exclusive use of property. Easements are not estates in real property because they provide for the nonexclusive use of property. An easement is "a nonpossessory interest in land belonging to

17

another which entitles the easement holder to limited use or enjoyment of the land." *Sagebrush Res., LLC v. Peterson*, 841 N.W.2d 705, 713 (N.D. 2014). Easements grant "a right to nonexclusive use of land for a specific, limited purpose." *Home of Econ. v. Burlington N. Santa Fe R.R.*, 736 N.W.2d 780, 784 (N.D. 2007). As the Debtors point out, the North Dakota Supreme Court has concluded the nonexclusive nature of an easement likens it to a license and distinguishes an easement from a lease for the same reason: "The major distinction between a lease and an easement or license is that a lease confers exclusive use and possession of the property against the world, including the landowner, whereas an easement or license merely grants a right or permission to nonexclusive use of the land for a specific, limited purpose." *Riverwood Comm. Park, LLC v. Standard Oil Co.*, 698 N.W.2d 478, 482 (N.D. 2005). Because a license's nonexclusive character prevents it from being an estate in real property, *Lindvig v. Lindvig*, 385 N.W.2d 466, 472 n.7 (N.D. 1986), an easement's nonexclusive character prevents it from being an estate in real property, too. As Debtors correctly point out, this conclusion is consistent with the laws of other states. *See Burdette v. Brush Mountain Estates, LLC*, 682 S.E.2d 549, 552–53 (Va. 2009) (collecting cases from nine states that hold "an easement is not an estate").

Caliber's arguments to the contrary are unavailing. While Caliber repeatedly argues that easements are ***interests*** in real property (D.I. 15 at 27-29), a mere interest in real property is not sufficient under North Dakota law to create a covenant running with the land. N.D. CENT. CODE § 47-04-26 (requiring that a covenant running with the land be "contained in a grant of an estate in real property"). Caliber relies on three out-of-circuit bankruptcy decisions to argue that an easement is an estate in real property. However, these cases apply the laws of states that do not require a grant of an estate in real property, and merely confirm that an easement is an interest in real property, not an estate in real property. *See Sanchez*, 2021 WL 1822708, at *12-

18

13 (applying Texas law, which does not require a grant of an estate in real property); *Alta Mesa*, 613 B.R. at 100 (applying Oklahoma law, which does not require a grant of an estate in real property); *Monarch*, 608 B.R. at 867 (applying Utah law, which does not require a grant of an estate in real property).

### 3.   " Made for the Direct Benefit of the Property"

The Bankruptcy Court further held that neither the Dedications nor the easements are covenants that run with the land because they do not directly touch on or concern the real property interests of the Debtors, namely the mineral interests. (Appx.9.A-0696-A-0697).   The Court concluded that the covenants provided no direct benefit to the mineral interests, but only personal benefits to the Debtors by providing transportation of the Debtors' personal property (the severed oil and gas) and related services for a fee.   Thus, the Dedications do not satisfy the requirement of North Dakota law that to run with the land, a covenant must directly benefit the real property.   N.D. CENT. CODE § 47-04-26 (a covenant running with the land is one that is "made for the direct benefit of the property . . . ."); *Beeter*, 771 N.W.2d at 286 ("[I]f a covenant or deed restriction benefits the grantor personally, and serves no real benefit to the land, then the covenant is personal in nature and does not 'run with the land' upon a subsequent sale of the property.").

Caliber argued that the Dedications did provide a direct benefit to the Debtors' mineral interests because they allowed the construction of the pipeline and related facilities which allowed the oil and gas to be transported to market.   Caliber contended that the gathering system and pipelines make the Debtors' mineral interests in place more valuable by providing a ready means of transporting them to market.   The Bankruptcy Court rejected this argument, concluding that the Dedications were granted, not to directly benefit the mineral interests, but to allow Caliber to perform the services it was obligated to perform under the MSA in order to be paid.

19

(A-0697-0698). "This purpose is evident from the totality of the MSA and the specific language which granted Caliber an interest in the Interests and Surface Rights only to the extent necessary for the performance of its obligations under the MSA." (*Id.* (citing MSA at § 10.1 & 14.1)).

I agree with the Bankruptcy Court.

A covenant providing for the provision of gathering, processing, and transportation of severed hydrocarbons in exchange for a fee, as in the MSAs, does not benefit (or "touch and concern") the mineral estate because it does not affect the use or enjoyment of the hydrocarbons in place, or the mineral estate. Instead, such covenants merely benefit the severed hydrocarbons, which are the personal property of the producer.

Caliber claims that "no case has directly addressed this issue under North Dakota law" and cites the same three out-of-circuit cases—*Sanchez*, *Alta Mesa*, and *Monarch*—in support of its arguments. (*See* D.I. 15 at 31). But the Debtors cite two cases applying North Dakota law, which are the more persuasive authorities. In *Beeter*, certain individuals sold a landfill to Municipal Services Corporation ("MSC"), and the deed conveying the landfill required MSC to pay those individuals "(6%) of the total gross revenue derived from the operation of a waste disposal facility" and further provided that that obligation was "perpetual and a covenant running with the real estate." *Beeter*, 771 N.W.2d at 284. After MSC filed for bankruptcy and sold the landfill in bankruptcy to Sawyer Disposal, the individuals sought to enforce the covenant against Sawyer Disposal. *Id.* The North Dakota Supreme Court held the covenant was unenforceable because it did not benefit the land: "The covenant in the deed in this case requiring payment of six percent of gross revenues from waste disposal operations does not in any manner benefit the land. It is a purely personal benefit to the [individuals] and appears, in fact, to be part of the consideration and payment for the land." *Id.* at 286.

Similarly, the Eighth Circuit, applying North Dakota law, concluded that in order for covenants involving payment obligations to run with the land, they must "expressly provide[] that the fees [are] to be used exclusively for the benefit of the property." *Slawson Expl. Co. v. Nine Point Energy, LLC*, 966 F.3d 775, 779 (8th Cir. 2020). Because the covenant there did not require "that the proceeds must be used to drill wells[,]" it did "not directly benefit the land," and, thus, was "not a covenant running with the land." *Id.*

Similarly, the Dedications at issue do not benefit the land under North Dakota law. NPE made the Dedications to "the performance of" the MSAs. (Appx.49.A-4021-4022; Appx.50-A-4131-4133 (MSAs § 10.1(a))). Generally, NPE fulfilled its performance obligations under the MSAs by paying Caliber fees for the midstream services Caliber provided. (Appx.49.A-4014-4015; Appx.50-A-4121-4124 (MSAs Article 3)). Neither the payments NPE agreed to make to Caliber nor the services Caliber agreed to provide in return benefitted the land. As to the latter, Caliber's midstream services did not benefit the use or enjoyment of the hydrocarbons in place, or the mineral estate. Rather, those services benefitted NPE's personal property—the severed oil and gas. *See Extraction Oil*, 622 B.R. at 600-01. NPE's payments to Caliber did not benefit the land either. Because there is nothing in the MSAs that requires Caliber to use those payments for any purpose, much less to benefit NPE's land, the Dedications are "not a covenant running with the land." *Slawson*, 966 F.3d at 779; *see also Beeter*, 771 N.W.2d at 286 (holding payment of a percentage of revenues generated by use of the land did not benefit the land).

In sum, Caliber cannot satisfy the "direct benefit of the property" element because the Dedications do not benefit the land.

###### C.   The Bankruptcy Court Correctly Determined that Caliber Does Not Have a Statutory Well Lien Securing its $150 Million Claim[8]

###### 1.   North Dakota Statute

Caliber argued that it was entitled to a Statutory Well Lien to secure future performance revenues under the RCA in the amount of $150 million.  The relevant statute provides:

> Any person who shall, [1] under contract with the owner of any leasehold for oil or gas purposes . . ., [2][a] perform any labor or furnish any material or services [b] used or employed, or furnished to be used or employed in the drilling or operating of any oil or gas well [3] upon such leasehold . . . is entitled to a lien under this chapter, whether or not a producing well is obtained and whether or not such material is incorporated in or becomes a part of the completed oil or gas well, . . . for the amount due that person for the performance of such labor or the furnishing of such material or services, including without limitation transportation and mileage charges connected therewith, and interest from the date the same was due.

N.D. CENT. CODE § 35-24-02 (brackets added).  Thus, only "two categories of persons are entitled to claim a lien:  (1) persons who furnish material or services used or employed in the drilling or operating of an oil or gas well and (2) persons who furnish material or services used or employed in the construction or repair of a pipeline as defined by the chapter." *Major Drilling Am. Inc. v. Redemption Energy LLC*, 2013 WL 3716172, at *4 (D. N.D. July 12, 2013).  The express language of the North Dakota statute limits such claims to services "used or employed, or furnished to be used or employed" in the operations of an oil or gas well.  *Id.*  The use of the past tense in the statute makes it clear that a lien will be given only for past services and not for future unperformed services.  The Bankruptcy Court correctly determined that Caliber is not entitled to a Statutory Well Lien for any services or materials that Caliber has not yet provided under the MSAs.  The statutory language makes clear that such liens only attach to "the amount

---

[8] The Bankruptcy Court allowed Caliber's secured claim in the amount of $7.1 million for unpaid costs related to midstream services previously provided under the Caliber contracts prior to NPE's rejection.  That decision, which does not relate to pipeline construction costs, is the subject of separate appeals pending before the Court and is not addressed herein.  *See* Civ. No. 21-1057-RGA, Civ. No. 21-1058-RGA.

due" for materials or services that already have been "furnished."  N.D. CENT. CODE § 35-24-02.  Caliber does not dispute this on appeal.

### 2.     Caliber Is Not Entitled to a Statutory Well Lien to Secure Future Performance Revenues Under the RCA

Caliber instead argues on appeal, as it did below, that its $150 million claim is for past services—namely, its construction of its pipelines for the transportation of the Debtors' oil, gas, and water.  Caliber contends that the MSAs specifically state that the amounts due to it are for, among other things, the construction of its pipeline, and the remaining $150 million was guaranteed to be paid under the RCA to reimburse the capital expended by Caliber in constructing the pipelines.

The Bankruptcy Court rejected Caliber's argument that the Debtors agreed to pay the costs of the pipeline construction as inconsistent with the actual language of the agreements.  (Appx.12.A-0880-0882).  Among other things, "None of the agreements between the parties contain a provision requiring the Debtors to pay Caliber for any of its specific construction costs.  Rather, "under the various agreements, Caliber invoiced, and the Debtors paid, monthly for Caliber's services based on the volume of product that was gathered, processed, and transported by it." (Appx.12.A-0880).  And the agreements provide that "Caliber retained title to the pipeline." (*Id.*)  While the Bankruptcy Court noted that provisions regarding the construction of the pipelines were included in Article 2 of the MSAs, it expressly found that the neither the MSAs nor the RCA required NPE to reimburse Caliber for its construction costs.  (*See* Appx.12.A-0880-0881).  The Bankruptcy Court concluded that the amounts due under the RCA were not for "past services performed by Caliber in building its pipelines" and thus could not form the basis for a Statutory Well Lien under the North Dakota statute.  (Appx.12.A-0882).

The Court agrees with the Bankruptcy Court's conclusion.  Neither the RCA nor the MSAs required NPE to pay any amount to reimburse Caliber for the construction of its pipeline

system.  Rather, those agreements required NPE to pay Caliber for Caliber's services of moving fluids through Caliber's pipelines.  Indeed, the monthly Minimum Revenue Commitment in the RCA required NPE to pay Caliber a minimum amount each month for those services, subject to credits NPE earned for using excess midstream services in prior months.

On appeal, Caliber concedes, "The contracts negotiated by the parties in 2012, and the subsequent amendments and restatements of those contracts, did not provide for any direct payments to Caliber for the pipelines it constructed." (D.I. 15 at 1).  Notwithstanding this concession, Caliber continues to assert that the remaining unpaid service fees for future months are for the "services" of constructing its own pipeline system.  (*Id*. at 43).  While Caliber asserts that "the Caliber Contracts … expressly state that the Minimum Revenue Commitment compensates Caliber for its costs of constructing … the pipelines" (*id*. at 18), Caliber cites to nothing to support this contention.

As the Debtors correctly point out, Caliber's argument that is has a Statutory Well Lien for this amount fails because it would eliminate the statute's requirement that "materials" must be "furnished"[9] for a Statutory Well Lien to exist for the amounts due for those materials.  N.D. CENT. CODE § 35-24-02.  It is undisputed that Caliber did not sell or rent its pipeline system to NPE and thus did not furnish its pipeline system to NPE within the statute's meaning.  (*See* Appx.5.A-0603:4-14).  Caliber cannot sidestep this statutory requirement by arguing the construction services Caliber provided to itself (as Caliber is the owner of its pipelines and they were not sold or rented to NPE) were in reality provided to NPE.  As the Debtors point out, if this interpretation were correct, a company transporting oil from the well by truck could assert a

---

[9] "'Furnish' means sell or rent."  N.D. CENT. CODE § 35-24-01.  So "furnished" means sold or rented.

lien on the purchase price of the truck by simply arguing it provided the oil producer truck-buying services.

Caliber argues that the MSAs and RCA "expressly state that the Minimum Revenue Commitment compensates Caliber for its costs of constructing" (D.I. 15 at 18), and "unquestionably compensated Caliber for the construction and operation of the pipelines" (*id.* at 43). But as the Debtors correctly point out, in the RCA, NPE agreed to pay Caliber a minimum monthly amount for its services, subject to certain credits or deficit fees depending on the volumes of fluids processed for the month. (Appx.48.A-3998-3999 §§ 1(a), 2). The RCA defines Applicable Fees to be nearly all fees NPE pays under Article 3 of the MSAs. (*Id.* § 1(a)). NPE receives Excess Credits "as to any Month [when] the sum of the Applicable Paid Fees during such Month is greater than the Minimum Revenue Commitment." (*Id.* § 3). Exhibits B and C of the RCA set forth the monthly Minimum Revenue Commitment and the aggregate Total Revenue Commitment "in respect of the Midstream Agreements." (*Id.* at Recital 3). The RCA requires NPE to pay Deficit Fees to Caliber if "the sum of the Applicable Fees plus any Excess Credits are less than the monthly Minimum Revenue Commitment." (*Id.* § 2). The RCA does not require NPE to reimburse Caliber for its pipeline system construction costs.

Nor do the MSAs. Article 3 of the MSAs sets out the fees associated with Caliber's services based on the volume of fluids processed. There is no fee for construction services set or even mentioned in Article 3 of the MSAs. Thus, as the Debtors point out, Caliber's actual pipeline construction costs, whether $1 or $800 million, did not affect the calculation of Applicable Fees—which, under the RCA, are nearly all fees set forth in Article 3 of the MSAs (Appx.48.A-3998 § 1(a))—or the determination of monthly Minimum Revenue Commitment or Total Revenue Commitment as set forth in the RCA. And Caliber's argument that the Deficit Fees are expressly for its pipeline construction services is belied by the existence of the Excess

Credits under the RCA. If the Deficit Fees were for construction services, they would not have been reduced by fees paid for midstream services. The Bankruptcy Court carefully analyzed Caliber's argument on this point and correctly held, "Caliber's argument was inconsistent with the actual language, and not a reasonable interpretation of the parties' agreements." (Appx.12.A-0880-0881). Finally, Caliber argues that the revenue commitment was included in the original MSAs. (D.I. 15 at 39-41). The original MSAs, however, included a volume commitment, not a revenue commitment. (Appx.44.A-3632 § 10.2; Appx.45.A-3730 § 10.2). The deficit fees were calculated based on the fees that would have been charged had monthly volumes met minimum forecasts. (*Id.*) Moreover, as the Debtors point out, the original MSAs expressly stated that deficit fees were "liquidated and agreed damages for Producer's failure to deliver the Monthly Minimum Crude [Gas, Produced Water and Fresh Water] Volume[s] in such Month." (*Id.* § 10.2(b)). The original MSAs therefore confirm that the monthly revenue commitment is not for the reimbursement of Caliber's construction costs but, instead, for gathering, processing and transportation services.

### 3.   The Bankruptcy Court Did Not Improperly Consider Extrinsic Evidence

Caliber further criticizes the Bankruptcy Court for referring in its July 7, 2021 written opinion to the presence or absence of certain facts in the record and argues that the Bankruptcy Court erred in considering and misinterpreting this extrinsic evidence. (Appx.12.A-0896-0898).

The record reflects that Caliber repeatedly argued below that there was "ambiguity" in the agreement at issue and urged the Bankruptcy Court to consider the "facts and evidence" and hold an "evidentiary hearing." (*See* Appx.2.A-0198:10-16, 0216:23-0217:4). The Bankruptcy Court obliged, but instead of supporting Caliber's construction of the agreement, the Bankruptcy Court concluded that the evidence undercut it. Caliber now claims that the terms of the RCA "clearly and unambiguously" provide that the Minimum Revenue Commitment was meant to

26

"compensate[] Caliber for the costs of constructing [its] pipelines." (D.I. 15 at 18-19, 34, 43-44).

Caliber argues that the Bankruptcy Court resorted to "extrinsic evidence" to "vary" the terms of

the relevant agreements. (*Id.* at 43). I disagree.

The Bankruptcy Court reviewed the plain language of the contracts and observed that

"none of the agreements between the parties"—neither the RCA nor the MSAs—"contain a

provision requiring the Debtors to pay Caliber for any of its specific construction costs."

(Appx.12.A-0880). Caliber concedes, as it must, that the "contracts negotiated by the parties …

did not provide for any direct payments to Caliber for the pipelines it constructed." (D.I. 15 at

1). The Bankruptcy Court cited provisions of the MSAs and correctly concluded, "Caliber

invoiced, and the Debtors paid, monthly for Caliber's services based on the volume of product

that was gathered, processed, and transported," and, thus, the amounts due under the RCA were

not for "past services performed by Caliber in building its pipelines" and could not form the

basis for a Statutory Well Lien. (Appx.12.A-0880, 0882). In reaching this conclusion, the

Bankruptcy Court did not consider anything but the unambiguous terms of the agreements.

While Caliber argues that the Bankruptcy Court improperly considered extrinsic evidence

in reaching its conclusion, I find this argument unavailing. Although the Bankruptcy Court

referred to certain evidence in its analysis, it only did so to demonstrate that Caliber's proffered

construction of the parties' contracts "was inconsistent with the actual language" of those

contracts. (Appx.12.A-0881). Among other things, the Bankruptcy Court found that: (1) Caliber

had not completed construction of its pipelines when the RCA was signed in September 2013;

(2) Caliber retained title to the pipelines it constructed and used them to provide midstream

services to third parties; and (3) neither parties' financial statements reflected any obligation of

the Debtors to pay for the cost of Caliber's pipelines. (Appx.12.A-0880-0881). These facts are

undisputed, and Caliber simply argues that the Court "misinterpreted" them. (D.I. 15 at 44-48).

The Bankruptcy Court's reference to these undisputed factual findings does not equate to improper consideration of extrinsic evidence. Although courts may not consider extrinsic evidence to "contradict" language of an unambiguous contract, *Burk v. State ex rel Bd. of Univ. & Sch. Lands,* 890 N.W.2d 535, 539 (N.D. 2017), nothing prevents a court from pointing out that a party's strained interpretation of a contract is inconsistent with both the undisputed facts and the "actual language" of the contract, which is all the Bankruptcy Court did here.

### D.     Caliber Was Not Entitled to Adequate Protection for its Asserted $150 Million Claim Following the Bankruptcy Court's Prior Rulings

Caliber argues that the Bankruptcy Court erroneously authorized the sale without adequately protecting Caliber's vested rights and liens. (D.I. 15 at 50-55). Section 363(f) of the Bankruptcy Code permits a debtor to sell an asset free and clear of a creditor's "interest . . . in property" in certain circumstances. 11 U.S.C. § 363(f). This power is subject to a caveat: any entity that has an "interest" in the property is entitled to adequate protection. 11 U.S.C. § 363(e). Section 363(e) requires adequate protection only for "an entity that has an interest in property used, sold, or leased, or proposed to be used sold or leased." The plain text of the statute makes clear that creditors that do not actually have an interest in property that is the subject of a proposed sale are not entitled to adequate protection.

Here, after evaluating and adjudicating the merits of Caliber's contention that it benefited from a covenant running with the land and held a Statutory Well Lien claim, Judge Walrath approved the proposed sale free and clear of Caliber's disputed $7.1 million secured claim under § 363(f)(4) of Bankruptcy Code. Recognizing the protection afforded by § 363(e), however, the Bankruptcy Court conditioned its approval of the sale on the provision of adequate protection in the amount of $7.1 million for what it ruled was a cognizable but disputed interest in property. (*See* Appx.10.A-0738-A-0739).

Caliber argues that the Bankruptcy Court should have required adequate protection for its purported lien securing, or purported real property interests protecting, Caliber's approximately $150 million claim even though the Bankruptcy Court had already ruled that Caliber did not have such a lien securing, or real property interest protecting, this claim.  (D.I. 15 at 51). Specifically, in support of its argument that the Dedications were entitled to adequate protection, Caliber argues that "[c]onsistent with the broad definition of 'interest' adopted by the Third Circuit,[10] courts have required adequate protection for an array of interests other than liens— including leases, a form of exclusive use agreement." (*Id.* at 52). And in support of its argument that its purported Statutory Well Lien was entitled to adequate protection, Caliber argues the Bankruptcy Court required the Debtors to provide adequate protection for its $7.1 million secured claim, even though it is still subject to dispute, but "without any explanation … declined to provide similar provision for Caliber's disputed $150 million lien claim." (*Id.* at 54).  Both of Caliber's arguments, however, ignore the Bankruptcy Court's clear prior rulings that Caliber did not have a lien securing, or real property interest protecting, its claim.  In other words, the Bankruptcy Court found no cognizable interest in property—disputed or otherwise— that would be entitled to adequate protection.

Once the Bankruptcy Court had adjudicated the merits of Caliber's alleged covenant running with the land under North Dakota law and its alleged Statutory Well Lien claim for $150 million, Caliber no longer held a legally cognizable "interest in property" for which adequate protection was required or appropriate under § 363(e) of the Bankruptcy Code.  At that point Caliber was, at best, an unsecured creditor.  As an unsecured creditor, it no longer held an "interest in property" entitling it to adequate protection.  *See, e.g., In re Chama, Inc.*, 265 B.R.

---

[10] *See, e.g., In re Trans World Airlines, Inc.*, 322 F.3d 283, 289-90 (3d Cir. 2003) (holding that airline workers' employment discrimination claims and flight attendants' rights under a travel voucher program qualified as "interests").

662, 669 (Bankr. D. Del. 2000) ("Since the Bank's security interest is avoided, it is a general

unsecured creditor.  It is therefore not entitled to any adequate protection."); *In re Patriot*

*Contracting Corp.*, 2006 WL 4452840 at *4 (Bankr. D.N.J. Mar. 28, 2006) ("As an unsecured

creditor of the Debtor, the IRS is not entitled to adequate protection.").  As the Agent correctly

points out, that is precisely why the Debtors sought the entry of the SJ Orders, the Claim

Reclassification Order, and the Rejection Order before proceeding with approval of the sale.

Caliber cites no authority for its contention that an alleged property interest that has

already been voided, invalidated, or disallowed by a court of competent jurisdiction remains

legally cognizable for purposes of adequate protection under § 363(e).  The Agent argues that it

would be absurd for a bankruptcy court to first determine that a creditor holds no legally

cognizable "interest in property" and then award the same creditor adequate protection under §

363(e) on account of an interest it found to be invalid.  If that were the correct approach, the

Agent argues, then every § 363 sale could be easily frustrated by creditors asserting baseless

claims against the assets that a debtor proposes to sell.  I agree.  If the losing party were entitled

to adequate protection of a disallowed claim or interest pending a resolution of all possible

avenues of appeal, going concern asset sales would become impossible to achieve in a

reasonable timeframe.

## IV.   CONCLUSION

Because none of the arguments raised by Caliber prevented the Bankruptcy Court from

authorizing the sale of the Debtors' assets free and clear of Caliber's purported contractual rights

or real property interests, I will affirm the Sale Order.[11]  For the reasons set forth herein, I will

---

[11] The parties' briefs address one additional issue that is not considered herein.  The Bankruptcy
Court held that the Third Circuit's decision in *In re SemCrude*, 864 F.3d 280 (3d Cir. 2017)
means, "Caliber's Statutory Well Lien d[oes] not extend to personal property owned by the
Debtors . . . because it was not perfected in the state in which the Debtors were incorporated,

also affirm the SJ Orders, the Claim Objection Order, and the Rejection Order.

A separate order will be entered.

---

Delaware." (Appx.12.A0892). Caliber does not challenge this ruling. (*See* D.I. 15 at 49-50). "Caliber notes, however, that its liens extend not only to the Debtors' interests in real property, including specifically the Debtors' oil and gas properties, but also to as-extracted collateral in the form of the oil and gas once it has been extracted from the ground." (*Id.*) The Agent takes considerable issue with Caliber's analysis. (*See* D.I. 27 at 5-17).

As Caliber correctly notes, however, "The precise parameters of the Bankruptcy Court's ruling based upon the *SemCrude* case are unclear since the court did not purport to identify what property of the Debtors was 'personal property' and what was not." (D.I. 15 at 50). As the Agent points out, "The Bankruptcy Court intends to hold further hearings to determine the value (if any) of the limited collateral subject to Caliber's asserted lien, which will determine the amount of its secured claim." (D.I. 27 at 7 n.5 (citing Appx.10.A-0738-A-0739; 11 U.S.C. § 506(a)(1) (a claim is secured only to the extent of the value of the collateral)). As the Bankruptcy Court has made no ruling, the Court has no occasion to consider this issue.